## COMMERCIAL PACIFIC CABLE COMPANY *vs.* THE STEAMSHIP MANCHURIA.

### July 3, 1908.

*Admiralty—Salvage—Basis of salvage compensation:*    Estimate of salvage compensation may be based on time consumed in salvage operations, risk of salving vessel—partially based on her value, value of salvors' services to claimant—partially based on the salved value of the vessel saved and partially on the danger she was exposed to, and upon the expenses incurred and the losses suffered by the salvor by reason of the salvage operations.

*In Admiralty:* Libel *in rem* for salvage.

*Ballou & Marx,* Proctors for Libelant.
*Kinney, McClanahan & Derby,* Proctors for Libellee.

DOLE, J.   The libel alleges, substantially, that on the morning of August 20, 1906, the steamship Manchuria, the libellee, of 13,638 tons gross and 8,750 tons net register and worth approximately $2,000,000, and laden with cargo worth, on the information of the libelant, $500,000, while proceeding on

a voyage from San Francisco to Honolulu and oriental ports, stranded on a coral reef in the bay of Waimanalo about 1,500 feet from the eastern shore of the Island of Oahu; that upon being so requested by the agents of libellee, the libelant, the charterer of the cable ship Restorer, of 3,180 tons gross and 1,284 tons net register, worth approximately $600,000, with cable on board worth approximately $100,000, and well equipped for salvage purposes, upon the said August 20th, began to raise steam on said Restorer, and as soon as possible thereafter, to wit, about three o'clock p. m. of August 21st, proceeded with her with all despatch to the scene of the disaster to render assistance to the libellee; that from said August 21st to September 16th, the Restorer stood by the libellee, rendering all the assistance required by those in charge of the libellee, such assistance consisting in the furnishing of grapnel ropes and buoys for use in towing by other vessels and for use of libellee in making fast her kedge anchors, and in towing on the libellee from August 22nd to September 4th, and from September 6th to September 16th, and generally in doing all things required of it in the salvage operations; that on the 14th of September the said Restorer assisted by the U. S. R. C. Manning and the U. S. S. Iroquois and by the power exerted by the libellee by means of her own winches, hawsers and anchors, drew the libellee about 150 feet toward deep water, and on September 16th, with such assistance, pulled the libellee into deep water, whereupon the said Restorer towed her to the port of Honolulu; that all the time the libellee was stranded she was in great danger of becoming a total wreck which would have been the result but for the efforts of the said Restorer and the skill and care exercised on the part of her master and crew; that during all such time the said Restorer was in peril from the character of the anchorage and the proximity of a lee shore, and particularly on September 14th, while changing her position to facilitate the wrecking operations, she was exposed to imminent danger of stranding. For which services the libelant asks to be awarded $300,000.

After the allowance of certain exceptions to the libel and amendments thereto, the Pacific Mail Steamship Company, the claimant intervening in these proceedings, answered the libel denying the alleged value of the said Restorer; that it or its agents requested the assistance of the Restorer; the alleged peril to the libellee while stranded and her danger of destruction because of her position on the reef; the alleged equalization of the strain of the several towing hawsers extending from the Restorer to the Manchuria by virtue of the appliances of the Restorer, or that she rendered any efficient service in preventing the Manchuria from moving further in on the reef; the paramount effect of the Restorer in the successful operations of the 14th and 16th of September in towing the Manchuria from the reef and into deep water, as claimed; peril to the Restorer from the position she was in during the salvage* operations, or that she was in any special danger on September 14th as alleged, except through her own negligence; and alleging that the point of stranding of the Manchuria was further than 1500 feet from the shore line,—the distance alleged in the libel; that the period during which the Restorer was keeping up a strain on the Manchuria by means of hawsers was from August 22nd to August 29th, and that from the latter date till after September 4th no strain was kept up except that on August 30th the Restorer was allowed at her own request to again use her engines and put a strain on the hawsers for her own convenience; that before the Restorer began operations the Manchuria had been driven inshore as far as it was possible for her to go, and that the Restorer's services in trying to prevent her being driven further on were useless; that the time the Restorer resumed towing was September 8th and not September 6th as alleged, but that such towing was of little account and could easily have been dispensed with; that on September 14th, the Manchuria having been lightened, she, by means of her own winches, hawsers and anchors, moved herself 250 feet toward deep water, and on September 16th by the same means worked herself into deep water, in which opera-

tions the Restorer, the Iroquois and the Manning "assisted in a very slight way," the "Restorer doing perhaps one-half of the work of one of the numerous anchors laid down by Captain Metcalfe," who was in charge of the salvage operations, and that the assistance of the said three vessels made no difference in the final result. The answer admits substantially the other allegations of the libel, or alleges ignorance and calls for proof.

The answer, in its fourth article, alleges an understanding between the parties whereby the use of the Restorer was considered as in the nature of a special and personal favor to the claimant and one Harriman, the nominal owner of the libellee, and not as an agreement for the performance of salvage services, which matter was set up in mitigation of damages. This allegation was excepted to by libelant and its exception was allowed and claimant was allowed to amend its answer in accordance therewith. The decision of the court, filed December 7, 1906, allowing such exception, is referred to in this connection. The defense raised by this article four of the answer as amended was not seriously pressed.

The following facts may be accepted as satisfactorily shown by the pleadings and evidence: The libellee, of the tonnage alleged, stranded at the alleged locality at an early hour in the morning of August 20, 1906; at about nine o'clock that evening the agents sounded the master of the Restorer as to whether he could go with her to the assistance of the Manchuria; he felt that he could not go without the consent of the libelant in New York, but agreed to begin at once to raise steam, the agents to pay the expense thereof, if reply of libelant was unfavorable, and proceeded to do so at about 10:15 o'clock the same evening; the next morning a favorable reply was received from libelant and at 3:07 o'clock p. m. on that day the Restorer started for Waimanalo bay, arriving there before dark; the next day the Restorer began to pull on the Manchuria and kept a greater or lesser strain on her hawsers according to the nature of the signals from the latter during the greater part of the time up to and including September 16th, on which day

the Manchuria was floated off the reef, and during the whole of such period she *stood by* ready to perform such service as might be required of her, and did assist the salvage operations in other ways, as alleged, besides towing.  In addition to the Restorer, the said Manning and Iroquois were on hand a part of the time and assisted in the final successful effort.

The heavy salvage of $300,000 claimed by the libelant is based upon its theory of the case, as shown by the pleadings and by evidence introduced in support thereof, that the Restorer, as operated by those in charge of her, was the chief agent in the operations which ultimately effected the removal of the Manchuria from her dangerous position to a place of safety.  I have no difficulty in finding that this theory is not borne out by the evidence.  I need not go into a discussion of the grounds of such conclusion more than to say that my mind has been irresistibly led by the evidence in the case and by my examination, with counsel of both parties, of the steam winches of the steamship Mongolia, which were conceded by both sides to be the counterpart of those of the Manchuria, to this view and to the nearly correlative conviction that to the steam winches of the Manchuria acting upon anchors fixed on the sea bottom was mainly due the work of moving her from the bed in the reef where she was lying, which must be regarded as by far the most difficult and most important part of the salvage operations.

This conclusion simplifies the case, leaving to the court the solution of the question as to the amount of compensation to be awarded to the libelant for the services of the Restorer, as it is not denied that it is entitled to something.

The trial was conducted on both sides with great enterprise and determination, leaving no positive vantage ground unoccupied and no possible resources untested.  The exhaustive character of the investigations and the searching cross-examinations have resulted in a mass of written evidence so great that it becomes neither practicable nor advisable for me to

try to do more than to refer to its most salient points bearing upon the remaining issue.

In the first place it is shown that the Restorer reached the locality of the wreck on the evening of August 21st, and reported to the master of the Manchuria immediately, by whom she was requested to come in further at daylight the next morning and give him some lines, which was done. From that time to and including September 16th the Restorer was on hand, towing the greater part of the time and all of the time acting under the direction of those in charge of the Manchuria. She was under no contract in regard to compensation for her services, and was held by the libellee to the work in spite of arrangements which had previously been made by libelant to send her to Midway Island during the period of the salvage operations to meet the steamship Mongolia of the Pacific Mail Steamship Company at sea off that island and convey a passenger, Mr. Ward,—connected with the libelant, from that vessel to Midway,—the latter vessel being under instructions not to approach the shore of that place on account of the dangerous character of the surrounding waters.

It appears reasonable to base an estimate as to the amount of salvage libelant is entitled to, upon the time consumed in the salvage operations, the risk the Restorer encountered in such operations,—which includes an estimate of her own value,—the value of her services to the Manchuria, which may be regarded as including an estimate of the value of the latter and the danger she was in. The libelant was not a volunteer but was requested by the claimant to assist the Manchuria without any arrangement at the time as to her compensation. This being the case, although libelant would have been entitled to remuneration at law if not in admiralty on the basis of *quantum meruit,* if the salvage operations had failed, yet, success having been achieved, the ordinary principles of salvage compensation may be applied, if its services contributed to the salving of the libellee. *Kennedy's Civil Salvage,* 29, 37.

"If the salvage service is dangerous or involves the con-

tinued exercise of skill or labor, the length of its duration will of course enhance the salvor's reward." Id. 133.

"One element in determining the amount to be awarded for salvage services is the value of the salving ship and cargo which have been exposed to risk; and the nature and extent of the risk are other elements for consideration. . . . Unless, where the salving vessel is a valuable steamer, the remuneration awarded to her owner is sufficient to cover the risk, the owners of such vessels will naturally discourage their employment in salvage services; a result which would be very disastrous, and which the court should do what it can to prevent." *The City of Chester,* 9 P. D. 182: 5 Aspinall, N. S. 311; *Kennedy's Civil Salvage,* 132.

The claimant insistently contends that the services of the Restorer, beyond towing the Manchuria into deep water and to the port of Honolulu after she had been pulled off the reef by means of her own steam winches and anchors, were of little value, and could have been as well performed by the U. S. R. C. Manning and the U. S. S. Iroquois, both of which were in attendance during a considerable portion of the salvage operations; and admits and contends that the effectiveness was only equal to one-half of one of its anchors. *Claimant's brief,* page 81, has the following: " That the Restorer aided is clear, but that her power cannot be compared to that of the moorings is clearer still."

A valuable portion of the evidence in the case is the letters and telephone messages forwarded by those on board the Manchuria from time to time to their agents in Honolulu, giving an almost daily account of conditions and the progress of the salvage operations. These letters for the most part do not offer intrinsic evidence of having been prepared for effect or to make evidence. From these it is clear that both Captain Saunders, master of the Manchuria, and Mr. Klebahn, representing H. Hackfeld & Co., Ltd., her agents, were convinced that the Restorer was useful and effective in steadying the Manchuria. They had the best possible opportunities of finding this out,

for being on board and signalling from time to time to the Restorer their directions as to the towing force she should apply, they were able to watch the effect of the varying strains she put on. For instance when the Manchuria was rolling heavily in consequence of a rough sea, they would order the Restorer to go on with as many revolutions with her propeller as they considered desirable, the result generally being, in their judgment, to steady her. August 24th Captain Saunders reported, "at 10.45 last night we started the Restorer again with 20 revolutions; at 2:10 a. m. signal for 25 revolutions, after midnight squall and at times some hard shocks from the sea hitting her under the quarter. I consider that the Restorer is very valuable to our assistance to steady the ship." Exhibit OOO, page 18; see also Klebahn's testimony before the U. S. Commissioner, 70, 175. Captain Metcalfe and Captain Pillsbury, two expert witnesses for the defense, on the other hand, gave as their opinion that the Restorer could have had no material effect in steadying the Manchuria. The following references throw some light on the need of steadying the ship if it was possible to effect such result: Captain Pillsbury said he thought "the greater part of the damage (to the hull) was done in the first twenty-four hours after the ship stranded." Vol. 2, Testimony, 558. The chief engineer's report of August 23rd, 9:20 a. m., three days after the stranding, has the following: " The smoke up-takes from all boilers are working badly out of their original position." (Exhibit OOO, page 15.) On August 30th, 10 a. m. (Exhibit OOO, page 130) Captain Saunders reported "one frame broken in starboard shaft alley forward of strutt seems to be a boulder under there and strutt bears hard on it. Our domestic fresh water tank became salt and brackish last evening so we could not drink it, had to order tanks," &c. Captain Metcalfe, referring to having been informed of this on the day of his arrival, August 29th, said, (Testimony, Vol. 3, page 903), " That indicated to me that she had cut herself down until a considerable amount of weight rested on that strutt; the sea was hitting her considerably

heavier on the port quarter." He was then asked "what was the effect of that?" and replied, "every movement that she made appeared to be crushing that strutt and the seams would open and the water spurt in." Captain Haglund testified, (Testimony, Vol. 1, page 237), that on Wednesday, August 22nd, when he was aboard the Manchuria, the greater part of the day, "there were several movements at times, thumping very heavily, sometimes the sea was lifting her up and especially the stern, she was very badly shaken at times." This was after she had been ashore over 48 hours. Saunders's report of August 26th, 9 a. m. (Exhibit OOO, page 21), speaks of new injuries in the breaking of five more saddles under the boilers. From these citations it would appear that the hull and its fixtures suffered considerable damage after the first twenty-four hours, even as late as August 30th, and that up to that date there was from time to time considerable movement of the vessel involving serious pounding on the reef. The log of the Manchuria shows that from the 20th to the 29th of August inclusive, the ship was striking heavily or pounding every day and contains also evidence of beneficial effect of strain kept up by the Restorer August 28th and 29th. The lay mind cannot easily avoid the impression from the evidence bearing on this point that such motion of the ship lying on a ragged coral reef, was dangerous to the hull and tended to cause serious injury to it and its internal fixtures. Certainly those in charge of the salvage operations at that time felt this and that it was important to steady the hull in order to prevent such injury as far as it might be possible to do so. This was attempted by means of the Restorer's pulling at varying strains according to the state of the weather and sea; and Captain Saunders and Mr. Klebahn, who were on board, believed that the effort was successful to an extent that was of value,— "very valuable," Captain Saunders says. Captain Pillsbury's opinion, if correct, that "the greater part of the damage was done in the first twenty-four hours after the ship stranded," presents a fair basis for an argument that the subsequent dimi-

nution of damage to the hull was due, to some extent, to the efforts of the Restorer. From the consideration of the evidence bearing on this point, I am led to the conclusion that the Restorer was of material effect in steadying the hull of the Manchuria, and thereby saving it from more extensive injuries than it received.

Much discussion took place in regard to the claim of libelant that by the special appliances of the Restorer the strain on the towing hawsers could be and was so equalized that her power was rendered more efficient than would have been the case without them. Both Metcalfe and Pillsbury were of the opinion that such equalization was impracticable on the ground that one of the lines would break before another. Pillsbury's testimony was guarded on this point. He said, " I think it would be impossible to fully equalize them, one line would break before another—that has always been my experience where there are several lines out." Testimony, Vol 2, page 578. His testimony shows that although he went aboard the Restorer he made only a cursory examination of the appliances in question. Id. Metcalfe admitted that the strains of the several lines might be equalized "a little," but that it was "a physical impossibility to equalize the strains exactly." Testimony, Vol. 3, page 838. Both witnesses based their conclusions upon the existence of a tension sufficient to break the tightest or weakest line, whereas the practical question is whether, as the tightest line stretches, the other lines would not be likely to meet the tension and overcome it before the first line should be stretched to its breaking point. Is it pertinent to this examination to settle the scientific question whether such strains may or may not be "exactly" equalized? In my view it stands to reason that when a vessel towing with several lines out, uses appliances for equalizing the strain, the results are likely to be in proportion to the elasticity of the lines, for as the weakest or the tightest one gives, the strain is immediately taken up by the others and the first one relieved. This would be the case to some extent where no equalizing appli-

ances were used, and where they are used the equalizing effect would obviously be greater and the danger of the tightest line breaking be less. The evidence in the case sufficiently shows that wire hawsers have elasticity.

The allegations of risk to the Restorer during the salvage operations and of special risk in connection with the movement of September 14th, when the position of the Restorer was changed at the request of Metcalfe, were contested with much vigor by the defense. It is clear from the evidence that the place where, and the conditions under which, the Restorer was operating, contained elements of danger such as a lee shore, shallow water, liability to heavy seas and the possiblity of fouling propellers with towing lines. The sea bottom was uncertain as a holding ground, being made up of patches of sand and patches of coral, the former offering little or no foothold for anchors and the latter being good holding material but with no give to it, thus under some conditions endangering mooring cables and anchor windlasses. The Restorer is a vessel built and equipped for the special service of cable laying and repairing, and is, with her appliances, of unusual value. Making full allowance for deterioration, the Restorer was worth with cable aboard at the time of the salvage operations, considerably over $600,000, and considering the cable on board at only its alleged value of $100,000, she was worth something over half a million.

Some light is thrown on the nature of the locality and of the conditions under which the towing vessels were operated, by the difficult situation the Restorer got into while changing her position September 14th. On that day, the Manchuria, through the combined efforts of her own steam winches and the three towing vessels, was moved about two hundred and fifty feet, and not swinging out by the stern as was expected but moving nearly astern, the position of the towing vessels had then to be changed. The Restorer attempted this movement without letting go her towing hawser and became unmanageable and drifted towards the reef; an anchor was lowered which

at first did not hold her; at length by paying out the towing hawser and more anchor chain, she was secured. An active contention arose in connection with this incident,—the libelant making the most of it to show a risk to the Restorer and the libellee, on the contrary, belittling its importance and endeavoring to show that whatever danger the Restorer was in was due to the negligence of her master, first, in trying to make the movement with his towing hawser attached, and second, through want of skill in handling his vessel in the emergency. As to the first point, it appears that after the Manchuria had been moved as stated, she stuck fast, and upon being asked to change his position, the master of the Restorer attempted to do so without casting loose his towing line to save time, "the idea being," as testified by him, "to get a pull that afternoon at high water. So to save time I hove her back and tried to take up that position before high water." Testimony, Vol. 1, p. 148. At the trial the libellee severely criticised the alleged unwillingness of the master of the Restorer to risk straining his boilers by raising steam in half the usual time, when promptness in reaching the Manchuria was important. There is an absence of consistency in now condemning him because he assumes some risk to his vessel with the expectation of thereby rendering a greater service to the Manchuria. The question of danger or risk in a situation created by conditions and circumstances is not necessarily disposed of on a theory of human imperfection. Human ability in an emergency is an indefinite quality. It depends on many things,—such as training, experience, condition of the nerves, temperament, health and others. When a catastrophe occurs in relation to human action, because one may easily imagine and even demonstrate how it could have been avoided, is no proof that it was entirely or even mainly due to human error. It is usually easier after the event to size up an emergency than before. A dangerous situation is one in which an accident is likely to occur even when ordinary skill is at hand; it is thus dangerous even though the presence of extraordinary skill would render

disaster extremely unlikely. Under this view I need not take up the discussion of the degree of skill exhibited by Captain Combe or how much his extraction of the Restorer was due to the assistance of Captain Pillsbury. A man with the responsibility of the safety of a valuable ship on his shoulders and his professional reputation as a ship master at stake, may not always be as cool in an unusual emergency as another, and the fact of calling for assistance, under the circumstances of this case, is evidence of due care and precaution rather than of anything to the contrary.

I find that the several positions of the Restorer during the salvage operations were, considering natural conditions and those created by the work of salvage, such as involved a risk to her sufficient to materially increase her compensation.

" Where . . . the salving vessel is a large and valuable steamer, fitted with complex and costly machinery, her value and the risk of its loss or of its serious depreciation . . . are obviously matters which deserve recognition in the assessment of salvage reward, not only in justice to the owner of the salving vessel in the particular case, but also in the public interest, and in order that the owners of such vessels may be encouraged to permit them to render salvage services." *Kennedy's Civil Salvage;* 131.

The discussion of the effectiveness of the Restorer in keeping the Manchuria from moving further in toward the shore occupied a large part of the time of the trial. A vast amount of testimony, expert and otherwise, was introduced bearing upon this important point and on her ability to pull the Manchuria off, dealing with the facts of the case and with scientific theories and opinions in regard to the effective pulling power of a steam vessel in smooth water, in a seaway, at anchor, unanchored, her difference in power tied up or steaming free, the effective power that ought to be realized out of the theoretic power, momentum, thrust, &c., &c. In connection with the investigation of the power of the Restorer in relation to this and other points of the case, the study of the effect of the surge

of the waves upon a vessel towing in a seaway was taken up. The evidence, including the photographs, leaves no doubt that during much of the period of the salvage operations there was a considerable swell in the region of such operations. Although the theoretical testimony was generally unfavorable to the proposition that the surge added something to the effectiveness of a towing ship pulling on a stranded vessel, the testimony of witnesses speaking from experience and observation was generally the other way,—Haglund, Piltz, Wight and even Merritt, introduced by the claimant, all recognize a jerking power of a towing vessel under such circumstances. The operation of this is obviously intermittent, and whether it is an addition to the effective power from the ship's engines, is not clear, inasmuch as the wave movement which causes the jerk, in its reaction tends to sag the tow line evidently producing an intermittent diminution of the effective engine power. It may be,—and this seems probable to me, that this intermittent action and reaction are substantially equal and that the only gain from the surging of a towing steamer is the resulting series of jerks which under some circumstances would have an advantage over a steady pull in starting a stranded vessel. As a force to prevent the Manchuria from moving further in shore, a series of intermittent jerks would, in my opinion, be of less value than the steady pull, as it would tend to keep her loose in her bed and so give the waves that would tend to move her ashore, a greater advantage. Captain Saunders said in his report of August 23rd, 6:30 a. m. (Exhibit OOO, p. 14), "ship draws forward 24 and aft 26 feet, and soundings on the outside are about 21 feet all around the ship." Such soundings were made during the afternoon of the 22nd,—the day that the Restorer began to tow on the Manchuria (Exhibit OOO, p. 12). Later she was ascertained to be hard aground amidships on a projecting mass of coral. Soundings made about August 29th showed about eighteen feet of water around the vessel. With this evidence of the degree the hull of the Manchuria was embedded in the sand and coral of the reef,

taken together with the great weight of the vessel, with all the evidence bearing on this point and on the power of the Restorer taken most favorably to the latter, I am not convinced that she was effective in holding the Manchuria from moving toward the shore, and find that such claim of the libelant is not proven.

It is in evidence that the Manchuria after she had been aground several days, appeared to be resting amidships on a coral ledge, which may have accounted for her sensitiveness to the action of the waves. This is well supported by the evidence of her movements in the succeeding days from August 25th to August 29th inclusive, as a vessel resting mainly amidships with her bow and stern less aground, or aground in a yielding substance like sand, would obviously swing around to a far less force than would be required to move her if she was resting solidly on the reef her whole length. The Manchuria's log reports that from 1 p. m. of August 21st to 12 midnight of August 24th, she headed S. S. E. and that thereafter her stern swung out from time to time until 1 a. m. August 29th when she headed S. 13° E. On this day Metcalfe arrived and took charge of the salvage operations and directed the Restorer to stop towing at 4:54 p. m. In this space of five days the direction the Manchuria was heading changed 9½ degrees toward the south and west which was toward the shore, by which her position was changed to a marked degree for the better inasmuch as her stern was swung out correspondingly toward the open sea, bringing her less broadside on to the reef than before. The broadside position is testified to by Metcalfe as being more dangerous and difficult than a head on position.

Here is a record showing a favorable change of the position of the Manchuria, which would naturally be produced by a pull on the stern from a position at or about right angle to the line of the hull. Such a force was exerted during those five days by the Restorer, and by the Manning after 2 p. m. of August 26th, and by cables of the Manchuria attached to anchors.

On the first day of this period, August 25th, in the afternoon a seven-ton anchor was laid with hawser to the starboard stern. On the third day another seven-ton anchor was laid with hawser to the starboard stern, and all this period there were two 2½-ton anchors with hawsers to port stern and two from port bow. Some credit must be given to these stern hawsers if they were hove taut from time to time as the Manchuria swung around. The log notes only one such action, but Captain Saunders in his deposition on pages 8 and 9 testified that "we hove our big anchors taut to keep the vessel as near steady as possible." This clearly refers to the seven-ton anchors mentioned above. It is in evidence that at 10:45 p. m. August 24th, the Restorer was directed to increase the speed of her engines and this was continued (Libelant's Exhibit OOO, p. 67); also that on the next day, the Restorer was making a greater speed with her engines than usual. This increased strain was kept up during these five days, her log showing from thirty to forty-five revolutions of her propeller. This evidence closely covers the time as shown by the Manchuria's log when she began to change her position for the better, about midnight of August 24th, which movement continued until the morning of August 29th, making a change in her direction for the better of 9½ degrees as shown above. From August 29th to and including September 2nd, a period of four days, she swung around two degrees more,—supposedly by the force of the steam winches alone, and the Restorer towing at only twenty revolutions; then from September 2nd to September 13th, there was no further movement. The fact that in the five days from August 24th to August 29th, the Manchuria swung, with the assistance of the Restorer, 9½ degrees, about two degrees a day, and in the next four days, without such assistance, she swung only two degrees, or one-half degree a day, is certainly favorable to the theory of the effectiveness of the Restorer in swinging the stern of the Manchuria to the sea. Although it is impossible under such circumstances to make an accurate estimate of the proportionate value of such efforts, it is the rule

of admiralty courts to weigh such evidence liberally for the salvor. I cannot resist the impression that the Restorer performed an important part in the advantageous movement of the Manchuria referred to. In this movement the jerking effect of a towing vessel caused by the surge of the waves, discussed above, is pertinent; for although such effect might be useless to prevent a vessel aground from being carried further in by the waves, it would obviously be of value in the case of a vessel aground mainly amidships in an attempt to swing her around.

There is considerable evidence in the shape of testimony and correspondence by Metcalfe as to a basis of compensation to the Restorer, his view being that she should be allowed her expenses for coal and engine room stores consumed and grappling rope and other gear used up in the salvage operations, and one thousand dollars a day. His theory of the case is that the services of the Restorer, besides standing by and towing the Manchuria, after she was floated, to Honolulu, had been of very slight value, and could have been dispensed with without prejudice to the Manchuria. The court differs from this view, as has already appeared, and while failing to recognize the Restorer as the chief agent of the salvage of the Manchuria, or as effective in preventing her from being carried further toward the shore than her position on the morning of the third day of the wreck, finds that she was of material service in steadying the Manchuria by means of towing hawsers and thereby saving her from receiving more serious injuries to her hull and its internal fixtures,—was of material assistance to the Manchuria's own anchors in preventing her from swinging to a position more broadside on to the shore than the Restorer found her on the morning of August 22nd,—was of material service in swinging her stern outward from the shore during the period from August 25th to August 29th, as set forth above, in which movement she was the chief agent, being assisted by the U. S. R. C. Manning during a part of that period and the four stern anchors of the Manchuria as above stated,—

was of material service, which, however, is not to be compared with the united power of the steam winches of the Manchuria in the final operations of September 14th and 16th, and was of material service in towing the Manchuria when floated to the port of Honolulu. Also, as set forth above, that the Restorer was exposed to risk in the salvage operations to an extent calling for recognition in estimating her right to compensation.

The question of the danger the Manchuria was in while aground is an important one in relation to the estimate of the amount of compensation the libelant is entitled to. It was warmly discussed on both sides and there is much evidence in the case bearing on its solution. In weighing this evidence I cannot avoid the conviction that her danger of becoming a total wreck was imminent. The injuries she received were serious, involving a heavy outlay for repairs. With the coming in of heavy seas from some distant storm, which is a common experience in the Hawaiian Islands, especially at the exposed northern shores, her injuries would have been much greater than they were, if not fatal to her eventual rescue. It is perhaps common human nature to make light of dangers past which are felt to be serious when one is confronted with them.

As a basis of the salvage award to be made in this case, the court will consider the time consumed by the Restorer in the salvage operations, the risk she encountered and the value of her services to the Manchuria, and the loss of material and expenses incurred by libelant. *The City of Chester,* 9 P. D. 182, 199, 203, 204; 5 Aspinall, N. S. 311, 315, 318; *Kennedy's Civil Salvage,* 138, 139. It is sometimes desirable to make a separate award for such losses and expenses. *City of Chester,* supra; *The Colon,* 18 Blatch. 277: 4 Fed. Rep. 469. The value of the Manchuria's cargo does not properly figure in the case as the salvage of that portion of it that was saved was effected by other means than the Restorer.

The question of the value of the Manchuria received conspicuous attention at the trial, much evidence being introduced

by both sides on the subject. This was obviously a matter of great importance while the claim of the libelant for the large compensation asked for on the theory that the Restorer was the chief agent in the salvage of the Manchuria, was still pending; but such claim having been disallowed in the preliminary part of this decision ,the question of value becomes of less importance; for under the view of the case adopted by the court it is substantially immaterial whether her value is as the libelant or the claimant contends; the latter estimate reaching $1,250,000, bringing the award here found within reasonable bounds.

In consonance with the foregoing considerations, I find for the libelant in the sum of $5,219.53 for consumption and loss of stores and expenses on account of salvage operations, and in the sum of $56,000 for salvage proper, making a total of $61,219.53.

In view of the demand of libelant for the heavy compensation named in the libel, which is deemed by the court to be unwarrantable under the facts of the case, costs are divided between the parties.

*Modified on Appeal.* See *Pacific Mail S. S. Co. vs. Com. Pac. Cable Co.*, 173 Fed. 28.